# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DONALD L. WALTON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-00157-TWP-TAB |
| | ) | |
| DR. MICHAEL PERSON, C.M.S. MEDICAL | ) | |
| SERVICES agent of CORIZON, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Dr. Michael Person ("Dr. Person"), and Corizon LLC ("Corizon") (improperly named "C.M.S. Medical Services" in the Complaint) (collectively, the "Defendants"). This 42 U.S.C. § 1983 civil rights action was filed on December 4, 2015, in the Madison Superior Court and then removed to federal court. Plaintiff Donald L. Walton, Jr. ("Mr. Walton"), an inmate in the Indiana Department of Correction, alleges the Defendants were deliberately indifferent to his serious medical needs. For the reasons explained in this Entry, the Defendants' Motion for Summary Judgment, (Dkt. 32), is **granted.**

## I. BACKGROUND

This statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Walton as the non-moving party. *See, Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

A.    **Hepatitis C Standard of Care**

Dr. Renee Fallhowe is employed by Corizon as its Chief Medical Officer. She has experience and expertise regarding the treatment and diagnosis of Hepatitis C virus ("HCV") infections. She has assessed and overseen care of patients with HCV and is aware of the standard of care for diagnosing and treating that condition. (Dkt. 33-3 at ¶ 3.)

HCV is a virus which over a period of years can cause a patient's liver to become inflamed. There are two types of HCV: acute and chronic. Acute HCV is a short-term viral infection. Acute HCV can lead to chronic HCV, which may cause the liver to become inflamed and damaged. (http://www.mayoclinic.org/diseases-conditions/hepatitis-c/symptoms-causes/dxc-20207369). *Id.* at ¶ 8.

Acute infection with HCV can be asymptomatic. For patients who develop an acute HCV infection, 15 to 40 percent clear the virus through the actions of their immune systems. Therefore, approximately 60 to 85 percent of patients eventually progress from acute infection to a chronic infection. Chronic HCV is often asymptomatic as well. The natural history of the effects of chronic HCV is generally slow. The progression of chronic HCV infection to fibrosis and cirrhosis may take years in some patients and decades in others—or, in some cases, may not occur at all. Most complications from HCV occur in patients with cirrhosis. *Id.* at ¶ 9.

HCV treatment has evolved dramatically over the past several years. Initially, HCV was treated with one drug that had low success rates. Treatment then evolved to a two-drug regimen with better cure rates. Then newer antivirals were used in a three-drug regimen with even better success, but the treatments had side effects and contraindications for a number of comorbidities. Now, there are newer regimens such as Harvoni with fewer side effects, better cure rates, and fewer contraindications. *Id.* at ¶ 10.

Management and treatment of HCV is a complex, evolving field. Medical providers employed by Corizon in Indiana rely on guidelines promulgated by the Federal Bureau of Prisons ("BOP") in treating inmates with HCV infections. *Id*. at ¶ 11. In March 2012, the BOP adopted Clinical Practice Guidelines titled Evaluation and Treatment of Hepatitis C and Cirrhosis. (Dkt. 33-4, March 2012 BOP HCV Guidelines.) In June 2014, the BOP issued Interim Guidance for the Management of Chronic Hepatitis C. (Dkt. 33-5, June 2014 BOP HCV Guidelines.) In July 2015, the BOP Guidelines were revised. (Dkt. 33-6, July 2015 BOP Guidelines.) They were revised again in April 2016. (Dkt. 33-7, April 2016 BOP Guidelines.)

Inmates with chronic HCV infections are enrolled in the prison's medical Chronic Care Clinic where clinical evaluation and laboratory testing are completed regularly, usually every three to six months. These evaluations include testing to determine liver enzyme elevations and other measurements, which can fluctuate dramatically in HCV patients. Long-term liver enzyme changes and other laboratory findings may be indicative of cirrhosis or damage to the liver. (Dkt. 33-3 at ¶ 12.)

In March 2012, the BOP adopted guidelines that approved the use of a triple drug therapy for treatment of HCV. Patients were prioritized for treatment based on the degree of liver fibrosis, cirrhosis, and certain other health conditions. *Id.* at ¶12; Dkt. 33-4, p. 2. Under the June 2014 BOP Guidelines, patients were prioritized for triple drug therapy based on criteria similar to the 2012 criteria. (Dkt. 33-5, p. 3.) Priority was also given if the patient was newly incarcerated and was receiving treatment at the time of incarceration. *Id*.

The degree of liver fibrosis may be determined in several ways. The AST-to-platelet ratio index ("APRI") is the BOP-preferred method for non-invasive assessment of hepatic fibrosis and cirrhosis. In June 2014, the BOP recommended prioritizing patients who had APRI scores of 1.0

or greater, or whose APRI score was between 0.7 and 1.0 along with other findings suggestive of advanced fibrosis. (Dkt. 33-5, p. 3.) An APRI score is calculated using a patient's AST levels (a liver enzyme which is often elevated in people with chronic HCV) and blood platelet count. Tests measuring another liver enzyme, Alanine Aminotransferase ("ALT"), is also helpful in monitoring liver damage; if cirrhosis occurs, AST levels may be higher than ALT levels. (Dkt. 33-3 at ¶ 14.)

In July 2015, the BOP revised its HCV Guidelines to reflect the availability of new treatments and established the new standard of care. (Dkt. 33-6.) The BOP provided that certain cases are at higher risk for complications or disease progression and require more urgent consideration for treatment. The patients at Level 1, or highest priority, are those with known decompensated cirrhosis, liver transplant candidates or recipients, patients with hepatocellular carcinoma (liver cancer), those with comorbid medical conditions associated with HCV, those taking immunosuppressant medications, and newly incarcerated inmates already receiving treatment. *Id*. at p. 11. Patients at Level 2, or high priority, include those with APRI scores greater or equal to 2.0, those with advanced fibrosis on a liver biopsy, those with Hepatitis B coinfection, those with HIV coinfection, and those with comorbid liver disease. *Id*. at p. 12. Patients at Level 3, or intermediate priority, include those with APRI scores between 1.5 and 2.0, those with Stage 2 fibrosis on a liver biopsy, those with diabetes mellitus, and those with porphyria cutanea tarda (a rare condition relating to liver function affecting skin or nervous system). *Id*. Patients at Level 4, or routine priority, are those with Stage 0 to Stage 1 fibrosis on liver biopsy, and all other cases of HCV infection that meet the criteria for treatment. *Id*.; Dkt. 33-3 at ¶ 15.

According to the BOP, a baseline evaluation of all HCV positive inmates should include a targeted history and physical examination, lab tests, calculation of the APRI score, preventive health measures, and education. (Dkt. 33-6 at pp. 7-8; Dkt. 33-3 at ¶ 16.) Most complications

from HCV infection occur in people with cirrhosis, so determining presence of fibrosis and cirrhosis is very important when prioritizing patients for treatment. (Dkt. 33-6 at p. 8; Dkt. 33-3 at ¶ 16.) An APRI score greater than 2.0 may be used to predict the presence of liver cirrhosis. (Dkt. 33-6 at p. 8; Dkt. 33-3 at ¶ 16.) Patients with APRI scores greater than 2.0 should have a liver ultrasound to evaluate the liver. (Dkt. 33-6 at p. 9; Dkt. 33-3 at ¶ 16.)

In April 2016, the BOP revised its HCV Guidelines to reflect the availability of three new treatment drugs. (Dkt. 33-7, at p. 2.) The 2016 Guidelines did not change the way APRI scores and other data are used to prioritize patients for treatment. *Id.* at pp. 11-12; Dkt. 33-3 at ¶ 17. In Indiana, inmates with chronic HCV infection are enrolled in the Chronic Care Clinic, where clinical evaluation and laboratory testing are completed regularly, usually every three to six months. Dkt. 33-3 at ¶ 19.

**B.**     **Plaintiff's Medical Treatment**

Mr. Walton began his most recent incarceration within the IDOC in 2009 at Pendleton Correctional Facility. He was incarcerated at the Correctional Industrial Facility ("CIF") during the time period of the allegations in his Complaint. In 2012, Mr. Walton collapsed from dehydration due to ongoing, undiagnosed stomach issues and diarrhea. (Dkt. 36.) He was treated at the emergency room of Saint John's Health System in Anderson, Indiana, for abnormal weight loss and chronic diarrhea. (Dkt. 36-1 at 3.) It was recommended that Mr. Walton have stool a specimen tested and that he see a G.I. specialist for further evaluation. *Id.*

Dr. Person became the medical director at CIF on June 1, 2015. He first saw Mr. Walton on August 25, 2015, when Mr. Walton visited the Chronic Care Clinic for assessment of his HCV infection. At that time, Mr. Walton's APRI score was .506, which was well below the 2.0 threshold that would indicate liver damage. (Dkt. 33-1 at ¶ 10.) During the visit, Mr. Walton was adamant

that he should have been treated in 2012 for his Hepatitis C infection. Mr. Walton reported that he was wrongfully diagnosed with bipolar disorder in 2011-2012 and he believed that was the reason he did not receive HCV treatment in 2012. Dr. Person reviewed Mr. Walton's medical records and his lab results. He concluded that Mr. Walton's HCV was stable because his APRI score and medical history did not indicate that priority treatment for his HCV infection was indicated. Per HCV protocol, Dr. Person scheduled Mr. Walton for a follow-up HCV Chronic Care Clinic visit in three months. *Id*.

On September 3, 2015, Mr. Walton was seen by Nurse Practitioner Barbara Brubaker ("Nurse Practitioner Brubaker") for his additional chronic complaints of ulcerative colitis, hypothyroidism and gastroesophageal reflux disease ("GERD"). *Id*. at ¶ 11. Nurse Practitioner Brubaker reported that Mr. Walton's HCV infection was improving and he had no associated symptoms. She reported that his ulcerative colitis was well-controlled and that he was receiving follow up treatment for hypothyroidism. *Id*. His GERD was also reported as improving. *Id*.

On January 5, 2016, Dr. Person saw Mr. Walton for complaints of facial numbness and blood in his stool. Mr. Walton reported that he had experienced seven "strokes" in the last several years. Dr. Person prescribed an esophagogastroduodenoscopy (EGD) test to examine the lining of the esophagus, stomach, and small intestine to determine if Mr. Walton's report of blood in his stool and his low hemoglobin count could be related to internal bleeding. *Id*. at ¶ 12.

On January 15, 2016, Dr. Person saw Mr. Walton related to his thyroid concerns. Mr. Walton reported that he was suffering from cirrhosis or fibrosis of the liver. Mr. Walton repeated his concerns that he should have been evaluated for receiving HCV medications several years prior, but that he was rejected because of his then diagnosis of bipolar disorder. He stated that his bipolar diagnosis was cleared by his psychologist and he should have received HCV medications

in 2012.  In addition to the EGD test, Dr. Person prescribed an ultrasound to evaluate Mr. Walton's gallbladder based on his complaints of upper right quadrant abdominal pain.  *Id*. at ¶ 13.

On January 25, 2016, Mr. Walton received an ultrasound of his abdomen which revealed no abnormalities.  His liver was a normal size and contour and there was no evidence of cirrhosis or fibrosis of the liver.  *Id*. at ¶ 14.

Mr. Walton's medical records reveal no indicators of any liver damage from his HCV infection.  In Dr. Person's medical opinion, Mr. Walton does not require treatment for his HCV infection at this time.  His condition has been continuously monitored by the health care staff while he has been incarcerated.  He has had regular lab work to check his liver enzymes, an ultrasound of his liver, and chronic care visits to assess his clinical presentation.  At no time has Mr. Walton reported any HCV symptoms, his January 2016 ultrasound was normal, and his clinical presentation has remained normal.  Dr. Person reports that there is no indication of fibrosis or cirrhosis in this patient.  Mr. Walton's APRI score has remained well below 2.0, his ALT levels have consistently exceeded his AST levels, and he has shown no objective indications of liver damage. Based on the BOP Guidelines, Mr. Walton is not a high priority for treatment.  Further, it is the opinion of Dr. Person and Dr. Fallhowe that Mr. Walton is in no imminent danger of harm. *Id*. at ¶ 15, Dkt. 33-3 at ¶ 24.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A "material fact" is one that "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for

trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As stated earlier, the Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). The Court does not weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

### A. Eighth Amendment Claim Against Dr. Person

At all times relevant to Mr. Walton's claims, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 8374 (1994); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d

766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014).

For purposes of summary judgment, the parties do not dispute the first element that Mr. Walton had a serious medical need.

Mr. Walton argues that the Defendants have been providing "half-measures of diagnosis." He alleges that he met the 2009 HCV treatment criteria in 2012 but that doctors denied him treatment at that time. More specifically, he contends that Defendants failed to comply with Saint John's Hospital recommendation for a stool sample evaluation and seeing a G.I. specialist on June 30, 2012. (Dkt. 36-1, p. 3.) He argues that delays in providing a full G.I. evaluation resulted in a diagnosis in April 2016 of celiac disease and precancerous cells throughout his small intestines.

However, these contentions not supported by medical records or expert opinion. More importantly, Dr. Person did not start treating Mr. Walton until August 25, 2015. "[A]n individual must be personally responsible for a constitutional deprivation in order to be liable." *Childress v. Walker*, 787 F.3d 433, 439 (7th Cir. 2015). Dr. Person could not have participated in any constitutional violation against Mr. Walton that occurred in 2012 or at any other time prior to 2015. Similarly, the December 5, 2007, lab results submitted by Mr. Walton, (Dkt. 36-1, p. 11), are not relevant to the claims brought in this action, especially in light of the far more recent lab results showing that Mr. Walton's APRI scores are below 2.0.

Mr. Walton also criticizes the most recent criteria for treating HCV, describing it as "deceitful". He has presented no evidence, however, demonstrating that the 2016 BOP Guidelines are in any way invalid. Moreover, neither Dr. Person nor Corizon played any part in developing the BOP Guidelines. The BOP Guidelines are applied throughout the federal and Indiana prison

systems.  The undisputed record reflects that Mr. Walton does not qualify for HCV treatment under the applicable guidelines, nor has he qualified for such treatment during the time of Dr. Person's doctor-patient relationship with him.

While Mr. Walton's fears of developing liver damage are understandable, Dr. Person prescribed an ultrasound that revealed that Mr. Walton's liver had a normal size and contour with no indications of cirrhosis.  Mere disagreement with a provider's medical judgment is not enough to prove deliberate indifference.  *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010).  "A prisoner may establish deliberate indifference by demonstrating that the treatment he received was blatantly inappropriate."  *Pyles,* 771 F.3d at 409 (internal quotation omitted).  "Making that showing is not easy:  A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances."  *Id.* (internal quotation omitted).  Mr. Walton has not shown that any treatment provided or referred by Dr. Person was so contrary to accepted professional standards that a jury could infer that it was not based on medical judgment.  *See Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir. 2008). Rather, Dr. Person responded reasonably to Mr. Walton's complaints and in accordance with applicable BOP Guidelines.  Dr. Person ordered an EGD to evaluate Mr. Walton's complaints of blood in his stool.  Dr. Person also ordered an ultrasound to evaluate Mr. Walton's abdomen, which revealed that his liver showed no evidence of cirrhosis or fibrosis.  Regardless of what lab tests may have shown in 2012, those numbers have improved and Mr. Walton's recent APRI score places him on the low end of the priority scale for HCV treatment.

A court examines the totality of an inmate's medical care when determining whether a defendant has been deliberately indifferent to an inmate's serious medical needs.  *Walker v. Peters,* 233 F.3d 494, 501 (7th Cir. 2000).  It is well-settled that while incarcerated, an inmate is not

entitled to the best possible care or to receive the particular treatment of his choice. *See Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir. 1997). Mr. Walton was "entitled to reasonable measures to meet a substantial risk of serious harm," *id.,* which is what he received.

Mr. Walton has not presented evidence sufficient to create a genuine issue of material fact as to whether Dr. Person was deliberately indifferent to his serious medical needs. Accordingly, Dr. Person is entitled to summary judgment on Mr. Walton's claim of deliberate indifference.

**B.     State Law Claims Against Dr. Person**

Dr. Person argues that he is also entitled to summary judgment on the medical malpractice and negligence claims because Mr. Walton did not file a complaint with the Indiana Medical Review Panel. *See* Ind. Code § 34-18-8-4. This would be true if the record established that Mr. Walton sought less than $15,000.00 in damages, in which case filing the complaint with the Indiana Medical Review Panel would not be required. Ind. Code § 34-18-8-6. The Complaint does not request any particular dollar amount in the prayer for relief. (Dkt. 1-1.)

Assuming for purposes of this motion that Mr. Walton was not required to file such a complaint, to succeed on a medical malpractice claim, he must show that Dr. Person owed him "a duty of care, that the doctor's actions did not conform to that standard of care, and that [Mr. Walton] was proximately injured by the doctor's breach." *Collins v. Al-Shami*, 851 F.3d 727, 734 (7th Cir. 2017) (citing *McSwane v. Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 910 (Ind. 2009)). In addition, "under Indiana law a prima facie case in medical malpractice cannot be established without expert medical testimony." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 753 (7th Cir. 2004). "A plaintiff must present expert testimony to establish the applicable standard of care and to show whether the defendant's conduct falls below the standard of care." *Id.* at 760. Mr. Walton has presented no expert testimony to rebut the standard of care presented by the

Defendants' medical expert, nor has he presented sufficient evidence demonstrating that Dr. Person's treatment fell below the applicable standard of care. Dr. Person is entitled to summary judgment on the state law claims.

## C.     Claims Against Corizon

As noted, Mr. Walton makes no allegations against Corizon in his Complaint. He does not allege nor has he presented any evidence showing that Corizon has a policy or custom of denying inmates treatment for HCV or of otherwise violating his Constitutional rights, and therefore, no Eighth Amendment claim is viable against Corizon. *See Glisson v. Indiana Department of Corrections,* 849 F.3d 372, 378-79 (7th Cir. 2017).

In addition, because Dr. Person is entitled to summary judgment on the medical malpractice and negligence claims, no state law *respondeat superior* liability can be attributed to Corizon as Dr. Person's employer. *See, Griffen v. Simpson,* 948 N.E.2d 354, 361 (Ind. Ct. App. 2011) (holding that under Indiana law, where the employee did not commit a tort, *respondeat superior* cannot apply to make the employer liable).

For these reasons, Corizon is entitled to summary judgment.

## IV.  CONCLUSION

For the reasons stated above, Defendants Dr. Michael Person and Corizon LLC are entitled to summary judgment on Mr. Walton's claims of deliberate indifference to a serious medical need, malpractice, and negligence. Accordingly, the Defendants' Motion for Summary Judgment, (Dkt. 32), is **GRANTED.** Judgment consistent with this Entry shall now issue.

    **SO ORDERED.**

Date:  6/28/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Donald L. Walton, Jr., #104842
Pendleton Correctional Facility
Electronic Service Participant – Court Only

Adriana Katzen
BLEEKE DILLON CRANDALL, PC
adriana@bleekedilloncrandall.com

Jeb Adam Crandall
BLEEKE DILLON CRANDALL, PC
jeb@bleekedilloncrandall.com